Good morning, and may it please the Court. My name is Mark Slonim. I represent the Makah Tribe. I'd like to reserve five minutes for rebuttal. I'd like to begin with just... Are you also splitting time? No, Your Honor. The State has decided not to argue. Okay, so it's listed as 17. So you've got the whole time for yourself to make all the arguments. Okay. I'd like to begin with just a few words about how we got here. The Makah Tribe occupies a remote reservation on the northwest tip of the Olympic Peninsula. There are no major salmon producing rivers in the tribe's territory. As a result, the tribe has always relied heavily on ocean fisheries for its subsistence and its economy, and it continues to do so today. That is why Makah was alarmed when Quileute and Quinault announced plans to enter the Pacific whiting fishery and preempt established Makah harvest in that fishery. Whiting migrate from south to north in the spring, so Quileute and Quinault are in a position to harvest them before they reach Makah fishing grounds. Makah attempted to reach an accommodation with Quileute and Quinault regarding their participation in the fishery for over a year, but was unsuccessful. Makah then asked the district court to define the western extent of Quileute and Quinault's usual and accustomed fishing grounds in the Pacific Ocean, which had not previously been adjudicated, to determine whether they had a legal right to fish in the offshore waters where the commercial whiting fishery takes place. The district court, after a 23-day trial, found Quileute was accustomed to fish 20 miles offshore at treaty times, but extended its UNA up to 56 miles offshore. It found Quinault fished up to six miles offshore at treaty times, but extended its UNA up to 41 miles offshore. The court erred in three respects. First, it relied on evidence of whaling and sealing to This was inconsistent with the Makah case, where the district court and this court rejected the use of whaling and sealing evidence to define tribal fishing grounds. Can we stop there and maybe you can answer, in the Makah case, they weren't interpreting the Treaty of Olympia, correct? It was the Treaty of binding in determining what happens here. For several reasons, Your Honor. First of all, Quileute and Quinault argued in the district court, and the district court agreed that the same principles must be determined, must be applied to every UNA determination, regardless of the particular treaty involved. And in fact, the court cited the Makah case as the basis for the longitudinal lines it All tribes have a right of taking fish, all tribes in their usual and custom grounds, all tribes are subject to a common 50% sealing on the treaty fishing right. All UNAs must be based on the same standards. So that's the first answer. The second answer is that throughout this case, the court has looked to the treaties and interpreted them together. And it is never suggested that the right of taking fish in one treaty is any broader or narrower than any other treaty. So that's the second answer apart from the specific ruling the district court made in this case. So, but, but if even if you go back to the Makah case, it doesn't tell you whether this evidence is probative or not, right? I think it does, Your Honor. In the Makah case, the district court made a specific finding that Makah went more than 40 miles offshore to hunt whales and seals. But it then limited Makah's UNA to 40 miles offshore, based on a finding that that's how far Makah went to fish. The necessary implication in limiting Makah to 40 miles in the face of that finding is that evidence of whaling and sealing could not be used to determine UNA. This court affirmed, this court did not set aside the finding that Makah went more than 40 miles to fish, to hunt whales and seals. In fact, the court said Makah may have gone 100 miles offshore to hunt whales and seals or to limit UNA to where it went to fish. And the travel issue is interesting because it's similar to some of the arguments you heard this morning. UNA has to be determined based on where a tribe went to fish, not where it went to travel, not where it went to hunt whales, not where it went to hunt seals. That's the necessary implication of the ruling in the Makah case. When I, when I was reading the Makah case, they were talking about, well, here's 100 miles and they possibly could have gone out there. I mean, I guess by canoe it was feasible, but that there was no evidence on the Makah, that there was no evidence that they were actually doing it. So it's sort of a lack of evidence case about that particular geographic point. And does it prove anything more than that? I think it does, Your Honor, because the district court specifically found that Makah went more than 40 miles to fish. It wasn't, they may have done it or, or we don't know. There's a specific finding. So when the court then limited Makah to 40 miles, it necessarily held that evidence could not be used. In this court, the court didn't say Makahs were not going more than 40 miles. They said they may have gone up to 100 miles for whales and seals, but it didn't look to that evidence. It looked to the fishing evidence and it defined Makah's UNA based on the fishing evidence. The second problem with the district court's relying on whaling and sealing evidence is even if the Makah case didn't solve the issue, there was no evidence in this case that either party to the treaty intended to expand Quillian and Quinault's traditional fishing grounds to areas where they hunted whales or seals. The treaty fishing right is specifically limited to usual and accustomed grounds. We know from the Makah treaty that the treaty drafters distinguished fishing, whaling, and sealing. They added a provision in the Makah treaty to the right of taking fish to encompass the right of whaling or sealing. There would have been no need to do that if the treaty councils, Governor Stevens spoke repeatedly of securing the Indian's right to fish where they always fished, as they had always done, as usual. There was no suggestion that that right would be secured in vast ocean areas where Quillian and Quinault did not fish, but hunted whales or seals. From the Indian's perspective, there were fundamental and pervasive distinctions between fishing, whaling, and sealing. In Quillian and Quinault societies, as with other coastal tribes, those were separate occupations. They were pursued by different people. There were separate ritual societies to which they belonged. There were separate ceremonies, art, and oral traditions surrounding each of those activities. They used separate gear in different canoes. They went hunting for whales and seals at different times and places. There is nothing to suggest in the treaty journals, or in any other records from the treaties, that the Indians equated those activities or understood that securing a right to fish in usual and accustomed grounds meant they were securing a right to fish in places where they didn't fish. What about the linguistic reference on fish? I think it's pronounced, which was Chinook, but then they say when it's translated, it means not just fish, but also means food, which of course could include something broader than we think of as the Andromedas fish. So how does that figure in in interpretation? In a couple of ways, Your Honor. First of all, the testimony, and this was testimony from Quillian and Quinault's expert, not our expert, was that fish could be used to refer to all fish. But it wasn't, those words were not used to refer to whales or seals. There was no example that the expert could come up with that said that those words were used to refer to whales or seals. And in fact, Dr. Hoard, Quillian and Quinault's experts testified that there were separate words for whales and seals and separate words for whaling and sealing, because those activities were common enough and ordinary enough to have words of their own. Dr. Hoard did testify that that word could be used in a more broader sense to include all food. But that can't be the meaning in the treaty. If that's the meaning in the treaty, then the right of taking fish includes hunting deer and elk, which it does not. There's a separate treaty provision to cover that. It would include... Well, that might be limited by the normal interpretation of like and kind. Ocean-going versus land-going, for example. But there was no evidence or any testimony that the word had this kind of ocean-going connotation to it. You had specific kinds of fish, salmon. You had all fish, which was another use of the term, which didn't include whales or seals. And then you had all food. There was no word for all aquatic species. There was no word or cultural concept that linked those activities. And there was just no testimony to support that. So let me turn to two other issues. The second issue that we raised in the case is the use of longitudinal lines to define the boundaries. And here, the court expressly relied on the McCaw case. But what the McCaw court did is it determined the outermost distance that McCaw went to fish, and that was 40 miles. They went further for whales and seals, but they went 40 miles to fish. And then the court drew a boundary that was 40 miles offshore and said, once we know the outermost distance for these ocean UNAs, we'll draw a boundary at that distance. In this case, the district court said that Quileute hunted fur seals up to 40 miles offshore. So assuming you can count hunting for fur seals. But it then drew a boundary on a line that's 56 miles offshore at its southern end. That added more than 400 square miles. Just that part of the decision alone added more than 400 square miles to Quileute's UNA, more than the entire area that's at stake in the two cases you heard just before this one. For Quinault, the court did the same thing. It found that Quinault hunted whales and seals up to 30 miles offshore, but then drew its western boundary along a longitudinal line that is 41 miles offshore at the southern end, adding 380 or 390 square miles to its UNA. Again, simply by not drawing straight lines that approximate the coast, which is what was done in the McCaw case. The district court said that there was evidence of fishing in multi-directions to support its result. There was no evidence for Quinault at all on that point. And as to Quileute, even if you look at the map they produced, and we didn't have an opportunity to respond to that map in the district court, and we have a lot of problems with it. But even if you look at that map, it includes... You're talking now about the Quileute? The Quileute, kind of the multi-directional radius map. Even if you look at that map, the district court's line adds about 200 square miles to what that map shows. The final issue that we've raised in the briefs concerns the finding with respect to Quileute fishing grounds. The district court relied on three anthropologists to find that Quileute fished 20 miles offshore at treaty times. But two of those anthropologists directly contradict the district court's finding. The first one, Frachtenberg, worked with the Quileutes in 1915 and 1916. Spent extensive time with them, is widely regarded as one of the primary authorities on the Quileute, and left a detailed description of their both in-river and offshore fisheries. And with respect to their offshore fisheries, he said they never went more than two miles offshore to catch halibut, and otherwise fished along rocks and reefs, which are three to four miles offshore in the Quileute area. Frachtenberg has a reference to Quileute travel 20 to 30 miles west, but that was specifically linked in his manuscript to whaling and sealing, not fishing. The second anthropologist cited was Dr. Singh, who did a comparative study of the coastal tribes in the 1950s. His report generally corroborates what Frachtenberg had to say. According to Singh, the Indians used only two small halibut banks south of Cape Flattery, one near James Island, which is a few hundred meters offshore, and one near Destruction Island, four miles offshore. The other Quileute ocean fisheries mentioned by Dr. Singh were all within five or six miles offshore. He did refer generally to halibut banks eight to 12 miles offshore, but those were the halibut banks off of the Macaw area off of Cape Flattery. In any event, Singh's ultimate finding, or Singh's reference to eight to 12-mile halibut banks, doesn't support the district court's 20-mile finding. So the first two anthropologists on whom the district court relied say the opposite of what the district court said. They placed Quileute within four or five, maybe 10 to 12 miles offshore at the most. Did you have a minute left? Did you want to reserve that? Oh, I thought this was on my 15 minutes. No, you have- Oh, then I'll take- You had 20 minutes, and you've used 19. Yes. I'm sorry. Oh, I'm sorry. I thought you- because the calendar says 20. You have a reprieve. Come back. Okay. So could you clarify for me now how many total minutes? So you have six minutes left? And six minutes left you could put back on the clock. Okay. Okay. I'll just finish this point and then save whatever's left for rebuttal. So ultimately what this came down to was the third anthropologist, who didn't leave a report or any manuscript, but has handwritten field notes that were preserved. One informant, who was also one of Dr. Singh's informants, in this field note refers to a fishing line 50 to 60 fathoms deep. And from that, the district court said, well, Quileute must have been fishing 20 miles offshore. We don't know what time period the informant was referring to. He was born in 1881, 26 years after the treaty, and was interviewed in this field note in 1949, almost 100 years after the treaty. Quileute and Quinault's experts say we don't know where he was referring to. He might have been referring to fishing off Cape Flattery, which Judge Martinez said did not begin until the post-treaty period. So you have a single ambiguous field note, and Dr. Boxberger, Quileute and Quinault's expert, also emphasized how unreliable field notes are. You have a single ambiguous field note in the face of two specific, detailed reports that tell you that Quileutes were fishing maybe 5 to 10 miles offshore. That, we think, was clear error. The only other thing Judge Martinez said was this was an area of peak halibut abundance. But it has never been the rule in this case that it is sufficient to point to abundant fish in an area and say we must have fished there. It's not enough for Suquamish to say fish were abundant in Bellingham Bay, so we went there. It's not enough for Lummi to say fish were abundant off of Whidbey Island, so we went there. You need something more than that. Thank you. Thank you. And now you do have time for rebuttal. May it please the Court, Lauren King, and today I'll be speaking on behalf of both the Quileute Tribe and the Quinault Nation. We are here because McCaw asked the District Court to determine the western boundaries of Quileute and Quinault's usual and accustomed areas. That is an inherently factual issue, which is why we had a trial, because it was a fact issue. The Court's factual findings were made after exhaustive review of the longest trial in the 47-year history of United States v. Washington. It was longer than the Bolt trial, right? It was longer than the Bolt trial, correct. Substantial evidence supports the District Court's factual findings of Quileute and Quinault's understanding of their treaty, the United States' understanding, and how far west Quileute and Quinault customarily obtained seafood at treaty times. The District Court properly applied long-established legal principles to these facts and set the boundaries accordingly. This Court should affirm the District Court's rulings in all respects. I'd like to just get straight into the evidence on the party's understanding. The Court found that it was clear from the evidence that all parties to the Treaty of Olympia understood the treaty fishing right to reserve broadly to Quileute and Quinault the right to take and continue taking seafood, including sea mammals, from Quileute and Quinault's customary places. There was specific evidence that the District Court sided to that demonstrated that the United States intended sea mammals to be part of the fishing right. Just as the Court in Shellfish found, this District Court found that in 1855 fish meant all aquatic animals and that that was the sense that the United States intended the term to have in the Treaty of Olympia fishing provision. The District Court specifically found that at the Treaty of Chehalis negotiations, which were the negotiations that led up to the Treaty of Olympia, that Stevens used the term fish to refer to whales. At that negotiation, Stevens also told the tribes, as to whales, they're yours, and that's cited in the District Court's opinion on page 10. It doesn't get much clearer than that. There is also specific evidence that the United States did not intend to parcel this right out by species and instead broadly promised the tribes a right to continue gathering their food from their usual places. We had a unique circumstance at the Chehalis negotiations where James Swan, a settler who spoke both English and Chinook jargon, watched those negotiations and said that the tribes there, which included Quinault Nation and two members of the Quileute tribe, were told that the treaty allowed them to, quote, procure their food as they had always done, and that's quoted on page 11 of the District Court's opinion. Stevens' statements in the minutes corroborate James Swan's records. He told the tribes he wanted them to, quote, take fish where you have always done so. That's cited on page 77 of the District Court's opinion. He also told the tribes he wanted them to have the salt and fresh waters and fish. That's in Macaw Excerptive Record 489. He told them as well he wanted them to have the water and food. That's in Macaw Excerptive Record 491. The court also determined what Quileute and Quinault understood their treaty to mean and that they would have understood the broad meaning as well in their own language. Of course, the treaty interpretation is a legal matter and is ambiguous here potentially, at least depending on how you parse it, that it's ambiguous as to what fish meant. So where do we know that the factual findings leave off and which we look at for clear error and the legal interpretation which we look at de novo begins? The court's review of the party's understanding of the treaty is reviewed for clear error. That is a factual matter. When you're applying legal principles like the canons of construction and the reservation of rights to those facts, that is a de novo review. It's a legal review. In the court's factual review of Quileute and Quinault's understanding of their treaty, it relied in part on the expert linguistic testimony of Professor Hoard who was the only expert of the nine at trial who had experience doing linguistic work with fluent Quileute and Chinook jargon speakers. Professor Hoard testified and the district court found that Quileute and Quinault would have interpreted that treaty right of taking fish through Chinook jargon pish. And again, I want to say in 1855, the meaning of fish was not just fin fish. It was all aquatic animals. That is the plain language meaning of the term in 1855. The words kemken and alita in the Quileute and Quinault language is how they would have interpreted that treaty fishing right. And those words are akin to our use of the word bread in the English language. Narrowest end, it means literally just that, bread, but at the broad end it means as in I'm earning my daily bread, my food, or my income. Kemken and alita similarly at the narrow end mean just salmon, but at the broad end they refer to seafood and food generally. They actually do refer to all aquatic animals, and that is cited by the district court and is available in the record at Quileute excerpt of record 300 and 345 to 47. And I also have to correct counsel for Macaw here that we did not have any word for fin fish. There was no word in Chinook jargon and no word in Quileute and Quinault languages that meant fin fish, and that is what the district court found and Professor Hoard testified. A great example is this fish society that Macaw brought up repeatedly in its reply brief. But if you look at Macaw excerpt of record 443, you can see that this so-called fish society included sealers, reflecting that Quileute did not interpret or categorize species the same way that we do in modern-day English, just as Professor Hoard testified and the district court found. Turning to the post-treaty actions, the court also found that they corroborated this broad understanding on both sides of the treaty. The Quileute's Indian agent in 1879 came to them and said, I want you to continue your fisheries of salmon and seal and whale as usual. The district court correctly found that there was nothing in the evidentiary record that indicated that either party intended or understood anything narrower than seafood. Law of the case also shows that sea mammals are included in the fishing provision. In 1974, Judge Bolt adjudicated both Quileute and Macaw's UNAs by reference to seal, sea lion, whale, and porpoise. And in the shellfish decision, the district court found, and this court affirmed, that fish includes all aquatic animals, which includes sea mammals. What's your response to your opponent's argument that even if the factual findings of the district court are correct, the western boundaries are way too broad and create hundreds of square miles of entitlement that shouldn't be there? With respect to the boundary, the district court found that the longitude lines it set for Quileute and Quinault matched the evidence. Specifically, Quileute and Quinault took off from various fishing locations at numerous villages up and down their coast, and that is in the record at Quileute Excerptive Record 3018-27. You can see all of those villages up and down the coast. And that they wouldn't just robotically fish somehow without the aid of GPS 40 miles from shore, but would instead pursue various species of whales and fur seals that migrate over the continental shelf north and south, just like longitude lines. And the court correctly held that fishers did not trace the coast and neither should the boundary lines. They should instead track what the fishermen were doing at treaty times. The federal regulators followed this same approach in 1986 when setting the same boundary lines for Quileute and Quinault. And finally, in McCaw's reply brief, they clarified that their northern boundary is where their 40-mile line intersects Vancouver Island, and that is 60 miles off of their treaty-time territory, which did not include Vancouver Island. One difficulty, it seems to me, is you don't have a district court finding that would put the UNA in this expansive region. And so you have the determination on using these longitudinal lines, but in a way you're missing the underlying determination. What is your response to that? Well, the district court, I would say, clarified what he meant, that those longitude lines fairly encompass what we proved at trial. Similar to what the district court found in the McCaw case, because we weren't just claiming 40 miles at trial. We showed evidence that these species were caught in the range of 30 to 60 miles offshore. And if you look at the maps, like Appendix 1, which shows our UNA, you can see the shaded area over the continental shelf where they would generally be pursuing all of these species  So it actually did match with the evidence, and the district court, as the fact finder, is accorded deference in that determination. So I'm going to turn now to the argument that Kool-Aid and Quinault should be allowed to finfish where they finfished, and sea mammal where they sea-mammaled, and shellfish where they shellfished at treaty times. That argument has been made numerous times in various iterations and has been rejected every time by the courts. Specifically in shellfish, the district court and this court said that that argument fundamentally misconstrues the nature of the reserved right, which is a much broader right to catch whatever species come into your area at treaty times. The Ninth Circuit expressly said, because the right of taking fish must be read as a reservation of the Indian's pre-existing rights, and because the right to take any species without limit pre-existed the Stevens treaties, this court must read the right of taking fish without any species limitation. And that's at 157F3rd at 644. The court further clarified that tribes did not even have to take shellfish at treaty times in order to be able to take them throughout their UNAs now. Quote, at treaty time, the tribes had the absolute right to harvest any species they desired, consistent with their aboriginal title. The fact that some species were not taken at treaty times, either because they were inaccessible or the tribes chose not to take them, does not mean that their right to take such species was limited. It's the same site for that quote. So under this court's ruling in shellfish, and under similar rulings for herring, hatchery fish, halibut, and whiting, a tribe did not need to take shellfish at all at treaty times in order to catch it throughout their UNA, and likewise, Quileute and Quinault did not need to take finfish at all in order to take it throughout their UNAs now. Instead, their UNA for finfish is coextensive with their UNA for all other species. And as the district court correctly observed, this is something that has been often explained in the 47-year history of this case. Turning to the Makah RFD, I want to address the burden of proof first. When we said that tribes should be subjected to the same standards, we meant the burden of proof. We didn't say that tribes should be subjected to each other's understanding of their treaties. And you're right, the Treaty of Olympia was not at issue in the Makah ocean fishing case. In that case, the 100-mile claim was rejected based on Makah's failure to show the requisite frequency. It was not a species distinction. And the courts appropriately focused in, zeroed in on Dr. Lane's express statement that although Makah would have been capable of going 100 miles offshore at treaty time, excuse me, they were not actually doing that at treaty times. She said this is not representative of what they were doing. They would have little reason to go further than 40 miles offshore at treaty time, she said, because stocks were abundant within 30 to 40 miles. So this is Makah's own expert saying that these 100-mile trips in 1897 were not representative of their treaty time behavior. And the courts appropriately held that mere capability without more does not support an inference of customary treaty time fishing. There are six other points that show that that case was about frequency and not a species distinction. First, the Ninth Circuit in its 1988 Lummi case stated that Makah's 100-mile claim was rejected on the basis of frequency, a failure to show frequency, and the court compared it to Tulalip's successful showing of frequency in that case. Second, the Ninth Circuit has twice said that the Makah case, as you mentioned, Judge McKeown, was not about treaty interpretation, which would have been a necessary analysis if you're going to abrogate the preexisting rights to whales and seals. Third, this court in the Shellfish case, which did do a treaty interpretation, held that fish includes all aquatic animals and that UNAs have never varied by species of aquatic animal. Finally, well, fourth, Makah told this court in its brief in Shellfish at Quileute Excerptive Record 5573, there have never been separate UNAs adjudicated for different species of fish. The Makah Ocean Fishing Places case, cited by the growers, is not such a case. There, the district court determined that Makah customarily fished at treaty times 40 miles from shore, but not 100 miles. Fifth, Judge Bolt in 1974 adjudicated both Quileute and Makah's UNAs based on sea mammals, which indicates that that was included species in fishing UNA determinations. Finally, Makah's own UNA would not extend the full 40 miles offshore or include the whole southwest portion without evidence of sea mammals because Makah presented evidence of halibut banks, discrete halibut banks, located in the northwest area of that UNA. So, turning back to the Shellfish case, the court there made another important finding that's relevant here, which is, at that time, the court reviewed a 27-year history of United States v. Washington and held that courts have never required tribes to adjudicate species-specific UNAs. The court here, below, reviewed the 47-year history of the case and held, too, that UNAs have never been species-specific. So that a tribe's UNA for one aquatic species is coextensive with its UNAs for all other aquatic species. And then, turning to the determination of the overall area, it was a broad determination that Quileute and Quinault caught aquatic species throughout their area out to 40 and 30 miles offshore. They did this from numerous coastal villages that stretched from north to south along the full range of their homelands, which, again, you can see at Quileute excerpt of record 3018-27. The court's decision on pages 13-57 meticulously details the numerous species Quileute and Quinault harvested from near shore all the way to waters over the continental shelf where whales and seals migrate north to south and were regularly harvested by Quileute and Quinault 40 and 30 miles offshore. I want to touch on the treaty interpretation issue because under Mille Lacs, the Supreme Court's ruling in 1998, the court said, it is a basic principle of treaty construction that you must examine the historical record and negotiations unique to that treaty and not on the basis of reference to another treaty. So here, the Macaw case, if it was about their treaty, cannot be read to construe the Treaty of Olympia. That is settled Supreme Court law. Extensive evidence supports the trial court's conclusion that all parties to the Treaty of Olympia understood it to reserve Quileute and Quinault's rights to take all aquatic animals within their customary ocean harvesting grounds. The record fully supports the UNA boundaries that the trial court established. The court's ruling is wholly consistent with every applicable principle of Indian law. There is no legal or factual basis for this court to depart from those principles in this case. This court should affirm the district court's ruling in all respects. Thank you. Let me start with the Macaw case and discuss the merits of whaling and sealing and then the longitudinal lines. On the Macaw case, counsel doesn't address the district court's finding that Macaw went more than 40 miles offshore for whales and seals. That finding was not upset by this court in focusing on evidence of fishing. Dr. Lane's report supported that finding. She said Macaw fished 30 to 40 miles offshore, but we couldn't determine the outer limits of whaling and sealing, and she provided evidence of extensive days-at-sea whaling and sealing and post-treaty evidence of Macaws going 40, 50, and 100 miles offshore. The problem here is the district court, instead of accepting what the Macaw court said, retried that case and decided it would have decided it on another basis, sufficiency of the evidence. That wasn't the basis for the decision. The Ninth Circuit did not characterize it that way in the Lummi case. It distinguished the evidence of whaling from evidence of fishing in distinguishing the Macaw case from the Lummi case. The Ninth Circuit has said the case wasn't about treaty interpretation because Macaws had a right to whale and seal. There was no need to decide whether there was a whaling and sealing right. It was expressed in the treaty. What the court said is that that evidence doesn't give you fishing UNA, and it has never been done in this case. The shellfish case is the opposite of this case. In the shellfish case, the plain language of the treaty told you that shellfish were fish, and that was in the shellfish proviso. You have a right of taking fish, provided you can't take them from certain areas. What the district court and this court both emphasized was the plain language of the treaty told us shellfish are fish. Here, we have plain language in the Macaw treaty that tells us whaling and sealing is not fishing, and there is nothing in the records of the Chehalis Council or other records relating to the Quillet and Quinault treaty that tells us anything different. There is a lot of statements about harvesting fish as usual, but that's not what Quillet and Quinault want. They don't want to secure their traditional fishing grounds in the rivers and in near shore waters. They want fishing grounds far offshore where they never fished. That's never been done in this case, and if it's done here, we'll be back with Lummi saying, even if we can't prove UNA off of the west coast of Whidbey Island with fishing, maybe we went sealing there, or Suquamish saying we went up to Bellingham Bay for seals, or South Sound Tribe saying we went farther north. We've spent 46 years adjudicating tribal UNAs, and we're going to start all over if there's a new basis for establishing UNAs based on whaling or sealing. The Macaw case rejected that a long time ago, and nobody has tried to do it ever since then. I'm still having some trouble that you're looking at a different treaty, and I don't know what the answer will be here until we sort through the evidence again following argument, but as a legal matter, I'm just having some trouble understanding why it's binding in effect. Well, it doesn't control interpretation of the Quileute Treaty. That's not what we're saying. What we're saying is if you want to know what the treaty drafters understood by the right of taking fish, and specifically whether it included whaling or sealing, the Macaw Treaty is the best evidence we have that it didn't include whaling or sealing. But the Macaw Treaty is a different treaty, too. I mean, it actually has the terms in there, so it just seems like it's distinguished. Now, it could mean that it means the same thing, but we have different treaty makers when we have a different tribe. Well, one party is the same. Yeah, one party is the same. Stevens, you know, the exact same treaty commission on the American side was present at Neah Bay and at Chehalis when the first attempt to negotiate the Treaty of Olympia was made. Two of those members were again present when the treaty was actually signed or agreed to by Quileute and Quinault, and Governor Stevens, the third member and the leader, actually signed the treaty. So we have the same personnel one month later negotiating the treaty, and if you want to know their intent about whaling and sealing, it seems to me what they did in the Macaw Treaty is the best evidence we have of that. And there's other evidence that people distinguished fish and whales. Stevens did it. We've got an 1849 court case where the court says Congress is less interested in whaling than fishing. The distinctions between fishing and whaling were not uncommon at the time of the treaty. And then on the Indian side, we have overwhelming evidence that these are different activities, that whaling and sealing were not fishing. They were important occupations, and they were different. And we don't have anything from the treaty journals or any other evidence that suggests that the Indians thought by reserving a right to fish in their usual and accustomed grounds, they were suddenly providing for a vast expansion of their traditional fisheries. Not where they always fished, but where they never fished. Thank you. You're welcome. The case just argued is submitted, Macaw v. Palut in Quinault Indian Nation. As in the other cases, again, excellent arguments and very good briefing, and we appreciate that by all parties here, and we're adjourned for the morning. All rise.
judges: Hawkins, McKeown, Foote